469 So.2d 309 (1985)
STATE of Louisiana, Appellee,
v.
Lugene MILTON, Appellant.
No. 16894-KA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*310 Indigent Defender Office by Richard C. Goorley, Richard E. Hiller, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Carey T. Schimpf, Tommy J. Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
SEXTON, Judge.
Defendant was charged by bill of information with simple burglary of an inhabited dwelling contrary to LSA-R.S. 14:62.2. On May 10, 1984, after trial by jury, the defendant was found guilty as charged. Subsequently, on May 14, 1984, the district attorney filed a habitual offender bill of information. Thereafter, the trial judge found the defendant to be a habitual offender, and on July 17, 1984 the defendant was sentenced to twenty-four years at hard labor, the maximum possible sentence under the habitual offender statute, LSA-R.S. 15:529.1. The defendant now appeals his conviction and sentence on the basis of eight assignments of error, four of which are abandoned. We affirm.

*311 Facts

On January 3, 1984, Bowen Stewart and his wife left their residence at 454 Gloria Street in Shreveport to go to work around 8:00 a.m. Mr. Stewart returned to his house around 9:15 a.m. When Mr. Stewart drove up into his carport and opened his door, he heard sort of a "clinking noise." After Mr. Stewart heard the clinking noise, he noticed that his back gate was slightly ajar. Mr. Stewart proceeded into the back yard, thinking that the clinking noise had been caused by utility company employees. However, Mr. Stewart did not go completely into the back yard and turned around and walked back to his carport. Mr. Stewart then heard a "kind of rattling noise, you know, like the fence rattling." Mr. Stewart assumed that he had heard a cat and entered his house through the carport door.
When Mr. Stewart walked into his kitchen, he noticed that the back door to the house was open. Not only was the back door open, the locks on the door had been knocked off and wooden splinters from the door were on the floor. Upon further examination, Mr. Stewart noticed that many items in the house had been moved. Mr. Stewart left his house at this point because he realized that his house had been broken into and that the culprit could possibly still be inside. After waiting outside for a couple of minutes he went back inside the house, obtained his shotgun, and exited the premises again.
While outside the house, Mr. Stewart met his neighbor, Mr. George Tindall, coming down the street in a car. Mr. Tindall had noticed a strange looking brown Pontiac parked on the side of the road as he drove up to his house. Mr. Tindall noticed the car because he had never seen it in the neighborhood before. When Mr. Tindall pulled up to his house, Mr. Stewart notified him of the robbery. Afterwards, Mr. Stewart went into his house to call the police, and Mr. Tindall checked his house. When both men came back out of their houses, Mr. Tindall observed a man get into the brown Pontiac. When Mr. Tindall saw that the Pontiac was going to drive off, he decided to get its license number. Mr. Tindall got in his truck and followed the Pontiac until he could note the car's license number. Mr. Tindall then returned to his house and reported the Pontiac's license number to Mr. Stewart. Shortly thereafter, he observed another strange car parked on Gloria Street. He observed two men get into the second car and wrote down the license number of this car also.
Before the police arrived, Mr. Stewart returned inside his house and determined that a .22 caliber pistol with ammunition and a fraternity ring were missing.
Lieutenant Jerry G. Wood was the identification officer dispatched to the scene of the crime. Officer Wood examined the apparent point of entry into the residence for fingerprints. Officer Wood was able to obtain several "usable" prints from the back door of Mr. Stewart's house. However, none of the fingerprints taken by Officer Wood were ever linked to the defendant.
On the evening after the burglary, Mr. Stewart noticed two strange lawn rakes propped up against his house near his back patio, which were subsequently retrieved by the Shreveport Police Department. Detective George Smith, upon being assigned to investigate the burglary of the Stewart residence, and was informed of the license number of the strange brown Pontiac which had been observed just after the burglary. Detective Smith determined that the license number given to him by Mr. Tindall was assigned to a brown Pontiac registered in the defendant's name.
The Shreveport Police Department detectives decided to place the defendant under surveillance. The defendant's car was found parked in an apartment complex parking lot on the morning of January 4, 1984. Between 1:00 p.m. and 2:00 p.m., the defendant was observed to get into his car and begin to drive off. However, he stopped in the apartment complex parking lot near a red truck from which he obtained a yard rake. After placing the rake in the *312 backseat of his car, the defendant exited the parking lot.
Shortly thereafter, the defendant's car was located by other surveillance officers who observed that the defendant had secured a passenger. The defendant proceeded to the Cross Lake Boulevard area of Shreveport, where the vehicle drove through the neighborhood at an extremely slow rate of speed. The defendant's vehicle then returned back towards the apartment complex parking lot.
In the meantime, Detective C.A. Lewis, while checking through records routinely filed with Shreveport Police Department by local pawn shops, noticed that a pawn ticket filed by the Gold Mart, located at 433 Kings Highway, listed a fraternity ring which had been pawned by the defendant around noontime on January 3, 1984. Detective Lewis proceeded to the Gold Mart, and contacted the proprietor of the establishment. The proprietor gave Detective Lewis the ring, and Detective Lewis notified the detectives involved in the surveillance operation. Mr. Stewart identified the ring recovered from the pawn shop as the ring that was taken from his house on January 3, 1984.
Upon receiving the information discovered by Detective Lewis, Detectives Ashley and Lindsey decided to place the defendant under arrest. At the time this decision was made, the defendant was driving away from a convenience store parking lot with three passengers. Detective Lindsey, in an unmarked unit, stopped the defendant's vehicle and ordered all persons out of the car. At this point, the defendant bent over the front seat toward the right side of the car, "as if to bend down into the front floorboard area." Upon Detective Lindsey's second command, the defendant exited the vehicle and was placed under arrest. His vehicle was towed to an impoundment lot.
Detective Ashley and Sergeant Patti Morgan searched the defendant's car after it had been impounded. Sergeant Morgan seized a lawn rake from the back of the defendant's car. She also seized several.22 caliber bullets which had been scattered on the car's floor around the driver's seat. Finally, Sergeant Morgan also seized a .22 caliber pistol, which was discovered under the passenger's seat along with a pair of suede gloves.
On January 5th, the defendant gave a voluntary statement to Detective Smith in the conference room of the Shreveport jail. He indicated that he had no knowledge of the burglary of the Stewart residence. When asked what he had done on January 3, 1984, the defendant indicated that he arose early in the morning and worked on his car. Later, the defendant said that he went by the house of Cordovas Laffitte. Mr. Laffitte offered to give the defendant $10 if the defendant would sell a ring for Mr. Laffitte at the Gold Mart. The defendant then said that he took the ring from Mr. Laffitte and drove around in his car for a while. The defendant indicated that he drove around to look for yards to rake because he raked yards for a living. Eventually, the defendant said that he went by the Gold Mart and sold the ring for $30. The defendant said that he returned to Mr. Laffitte's house and gave him $20.
During trial it was established that the .22 caliber pistol seized from the defendant's car was the pistol which had been stolen from Mr. Stewart's house. Also, the defense established that Fabian Laffitte, the cousin of Cordovas Laffitte, was the person who was occupying the front passenger seat of the defendant's car at the time of his apprehension.

I.

Sufficiency of Evidence to Support Burglary Conviction Assignment of Error No. 7
In this assignment of error, the defendant argues that the evidence was insufficient to support this burglary conviction. Specifically, the defendant argues that there was no evidence to show that the defendant made an "unauthorized entry" into the victim's house. On review of the sufficiency of the evidence to support a criminal conviction, it must be determined whether, after viewing the evidence in the light most favorable to the prosecution, *313 any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In this cause, the state's case consisted almost entirely of circumstantial evidence. Examining the level of proof in a circumstantial evidence case, in the light of Jackson v. Virginia, supra, does not require a stricter standard of review. State v. Chism, 436 So.2d 464 (La.1983). As Chism points out, and as the Supreme Court reiterated in State v. Smith, 441 So.2d 739 (La.1983), the circumstantial evidence rule of LSA-R.S. 15:438 simply emphasizes the need for more careful observation and provides a helpful methodology for its implementation in cases which hinge on an evaluation of circumstantial evidence. Stated somewhat differently, LSA-R.S. 15:438 provides an evidentiary guideline for the finder of fact when circumstantial evidence is involved and facilitates appellate review of whether the fact finder could have found the defendant guilty beyond a reasonable doubt. Thus, where circumstantial evidence is used to convict, exclusion of every reasonable hypothesis of innocence becomes a component of a more comprehensive reasonable doubt standard. State v. Wright, 445 So.2d 1198 (La.1984). It is important to note that not every hypothesis of innocence must be excluded but only those which are reasonable. State v. Bindom, 410 So.2d 749 (La.1982), State v. Austin, 399 So.2d 158 (La.1981).
The record shows that the defendant's automobile was observed near the scene of the crime shortly after its commission. The record also shows that the defendant pawned a ring taken from the victim's house within just a few short hours of the commission of the crime. When the defendant's car was placed under surveillance, Shreveport Police Department detectives observed the defendant to secure a rake and to cruise slowly through a residential area of the city. Considering the fact that Mr. Stewart discovered two lawn rakes outside his house during the afternoon after the burglary, there is a strong indication that the defendant had established a modus operandi of using his lawn raking business as a cover to spot and burglarize desirable targets. Finally, when the defendant was ordered out of his vehicle by the arresting officer he was seen to lean over toward the floorboard on the passenger side, the location the detectives discovered the pistol taken from Mr. Stewart's house.
In brief to us, the defendant concedes that "he may be guilty of the offense of Illegal Possession of Stolen Things." However, he asserts that the only evidence implicating him is his possession of the stolen items and the observation of his car near the scene. He contends that this evidence, particularly when the lack of fingerprint evidence is considered, is insufficient to convict him under the legal standard previously enunciated. We disagree. There is considerable additional evidence which we have previously discussed in detail. When all of the evidence is considered, it is our view that this evidence when viewed in the light most favorable to the prosecution, even under the careful scruntiny required of circumstantial evidence per Smith, supra, and Chism, supra, the hypothesis that the defendant was not a principal in this offense is not reasonable. This assignment lacks merit.

II.

Re-opening of State's Case in Habitual Offender Hearing Assignment of Error No. 3
In this assignment of error, the defendant argues that the trial court erred in allowing the state to reopen its case to introduce additional evidence in the habitual offender hearing. The record shows that on July 6, 1984, a multiple offender hearing was held subsequent to the filing of a multiple offender charge by the state. During that hearing, the state failed to produce evidence that the defendant had been "Boykinized" when he pled guilty on April 15, 1981 to the burglary offense, *314 which was the basis of the multiple offender charge.
In order to enhance a penalty under the multiple offender statute, the state must affirmatively prove that the defendant was fully "Boykinized" in the predicate offense if that conviction resulted from a guilty plea. State v. Bland, 419 So.2d 1227 (La.1982); State v. Lewis, 367 So.2d 1155 (La.1979).
After the closure of the state's case, and subsequent to the defense argument that the state had failed to sustain its burden with respect to proof of Boykin, the trial judge ordered a recess of some fifteen to twenty minutes. At the conclusion of the recess, the state filed a transcript of the colloquy of the defendant's previous conviction which showed full compliance with Boykin.
The defendant's contention has been squarely rejected in State v. Belton, 441 So.2d 1195 (La.1983). In Belton, after the state had rested its case, the defendant objected to the sufficiency of the state's evidence on the ground that the minutes offered by the prosecution did not reflect that the defendant had been advised of and waived his rights as per Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The trial judge ordered a transcript made of the earlier guilty plea colloquy and took the matter under advisement. Four days later, after reviewing the transcript and finding that the defendant was properly "Boykinized," the trial judge found him to be a second felony offender. In concluding that the action of the trial court was not improper, the Supreme Court noted the function of a proceeding under the habitual offender law in the following terms.
A proceeding pursuant to the habitual offender law is not a prosecution for a separate criminal charge. It is to enhance the penalty for the subsequent offense; it only involves the sentencing for that crime. State v. Walker, 416 So.2d 534 (La.1982); State v. Stott, 395 So.2d 714 (La.1981). Hence, the trial judge's actions in the instant case in taking the matter under advisement and then considering additional evidence four days later is not contrary to La.Code Crim.P. art. 765(5). This article specifies the normal order of trial and is inapplicable to sentencing procedure. Similarly, the consideration of additional evidence in the sentencing phase of the instant case does not constitute double jeopardy. State v. Stott, supra; State v. Langendorfer, 389 So.2d 1271 (La.1980).
This assignment of error is without merit.[*]

III.

Sufficiency of Evidence of Predicate Conviction Assignment of Error No. 8
In this assignment of error, the defendant argues that the evidence offered at the habitual offender hearing was not sufficient to identify the defendant as the person who committed the predicate burglary. This assignment of error is patently without merit.
The state's evidence to identify the defendant with the previous burglary partially consisted of the testimony of Detective George C. Smith. Detective Smith testified that he arrested the defendant for a burglary committed on December 8, 1980. The "pen package" offered into evidence by the state conclusively established that the defendant, in entering a guilty plea on April 15, 1981, pled guilty to the offense for which Detective Smith arrested him. Deputy Sheriff Sergeant Gary Bass testified that the fingerprints contained in the records of the Sheriff's Office for Lugene Milton matched the fingerprint card contained in the "pen package." Additionally, the state made a motion to fingerprint the defendant in open court so that his fingerprints could be compared to those contained *315 in the pen package and those contained in a fingerprint card on file with the Caddo Parish Sheriff's Department. However, defense counsel stipulated that if the defendant were fingerprinted in open court, his fingerprints would match the fingerprints shown on the card on file with the Sheriff's Department.
Since the fingerprints shown on the card contained in the Sheriff's Department files matched the fingerprints shown in the pen package pertaining to Lugene Milton, the stipulation and other evidence is sufficient to identify the defendant as the Lugene Milton incarcerated with the Department of Corrections for the previous December, 1980 burglary. This assignment lacks merit.

IV.

Excessive Sentence Assignment of Error No. 6
In this assignment of error, the defendant argues that the trial court erred in imposing an excessive sentence of 24 years at hard labor for his crime of burglary of an inhabited dwelling. As a second habitual offender, the defendant was subject to a prison term of not less than one-half the longest possible sentence for the original crime charged and not more than twice the longest possible sentence prescribed for a first conviction. LSA-R.S. 15:529.1(A)(2)(a). Under LSA-R.S. 14:62.2, the defendant was facing a minimum sentence of not less than one year, without benefit of parole, probation or suspension of sentence, nor more than twelve years. The trial judge determined that the defendant should receive the maximum possible sentence of twenty-four years.
During the sentencing hearing, the trial judge found that the defendant's past criminal record was sufficient to demonstrate his "ill intentions" toward his community. The trial judge was particularly influenced by the fact that he had heard a preliminary examination prior to the trial of this cause in which the defendant was accused of fourteen counts of burglary of inhabited dwellings. This fact coupled with the fact that the defendant had previously been given a three year burglary sentence as recently as August 18, 1981 influenced the decision of the trial judge to impose the maximum sentence.
A sentence will be deemed excessive where it is grossly out of proportion to the severity of the crime, or where it is nothing more than the needless imposition of pain and suffering. State v. Smith, 433 So.2d 688 (La.1983). The trial judge has a wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir.1983).
Maximum sentences are reserved for cases involving the most serious violations of the charged offenses and for the worse kind of offender. State v. Quebedeaux, 424 So.2d 1009 (La.1982). Prior criminal activity is one of the factors under LSA-C.Cr.P. Art. 894.1 to be considered by the trial judge in sentencing a defendant. Prior criminal activity is not limited to convictions. State v. Washington, 414 So.2d 313 (La.1982).
This defendant can be catagorized as the worst type of burglary offender. He had a prior burglary conviction in 1981 resulting from his entry into an apartment. His imprisonment for that prior burglary obviously had no deterrent affect on his aberrant conduct. The evidence adduced by the state tended to establish that the defendant's criminal activity was carried out in a calculated, deliberate manner. Evidently, the defendant searched for burglary targets in his car. He used his lawn raking business as a cover for his criminal activities. He apparently carried out his crime with the use of gloves so that he could not be easily detected. He destroyed property by breaking and entering premises, and he only took items which could be easily fenced. Finally, the record shows that the defendant had numerous counts of burglary still pending against him at the *316 time that he was sentenced. This factor tends to show that the defendant was engaging in a comprehensive burglary operation. The fact of pending offenses is a legitimate sentencing consideration. State v. Washington, supra; State v. Williams, 441 So.2d 832 (La.App. 3d Cir.1983).
Consequently, the defendant's sentence, even though it is the maximum possible, cannot be considered constitutionally excessive. Due to the defendant's obvious disregard for the property rights of his fellow citizens and due to his systematic endeavors, a twenty-four year sentence does not amount to the purposeless and needless imposition of pain and suffering. This assignment lacks merit.
Finding no merit to the four assignments of error argued before us, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[*] The proof complained of in the instant case involved a sentence enhancement. It did not concern an essential element of the state's case. Therefore, State v. Collier, 438 So.2d 652 (La. App. 2d Cir.1983), is clearly distinguishable.